E-FILED
Thursday, 23 January, 2014  04:59:52 PM
Clerk, U.S. District Court, ILCD

## UNITED STATES DISTRICT COURT
## CENTRAL DISTRICT OF ILLINOIS
## URBANA DIVISION

| | | |
|---|---|---|
| FRANCISCO PEREZ, ID#B-78905, | ) | |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | Case No. 12-CV-2102 |
| | ) | |
| PAUL TALBOT, M.D., | ) | |
| | ) | |
| Defendant. | ) | |

## OPINION

Pro Se Plaintiff Francisco Perez, an inmate at Danville Correctional Center in Danville, Vermilion County, Illinois, filed a Complaint (#1) on March 27, 2012, alleging, pursuant to 42 U.S.C. § 1983, that Defendant Paul Talbot, M.D., was deliberately indifferent to Plaintiff's serious medical needs. Defendant filed a Motion for Summary Judgment (#42) on August 9, 2013. Plaintiff filed his Response (#45) on September 4, 2013, and Defendant filed his Reply (#48) on October 7, 2013. On November 14, 2013, Plaintiff filed a Sur-Reply (#49) to Defendant's Reply (#48). Defendant filed a Motion to Strike (#50) the Sur-Reply on December 2, 2013. Plaintiff filed a Response to the Motion to Strike (#51). For the following reasons, Defendant's Motion to Strike (#50) is DENIED, but Defendant's Motion for Summary Judgment (#42) is GRANTED.

## BACKGROUND[1]

---

[1]These facts are taken from Defendant's statement of undisputed facts and documents submitted by the parties. This court has only included facts which are adequately supported by evidence in the record.

Plaintiff is an inmate of the Illinois Department of Corrections at the Danville Correctional Center (DCC). Defendant is a physician licensed to practice medicine in the State of Illinois and was employed by Wexford Health Sources, Inc. (Wexford) as the medical director at the DCC at all times relevant to Plaintiff's Complaint. On July 14, 2011, Plaintiff was playing basketball and injured his left knee. Plaintiff went to the health care unit and was seen by Registered Nurse Steve White. Nurse White's note on the Offender Injury Report indicated that there was no swelling in Plaintiff's left knee, no indication of discoloration, and the knee had full range of motion. Nurse White advised Plaintiff to ice the joint and provided Plaintiff Motrin. Nurse White told Plaintiff to return if there was an increase in pain or swelling. On July 15, 2011, Defendant reviewed Nurse White's note and concluded that Plaintiff should return as needed.

Plaintiff saw Nurse Miles on July 20, 2011, and Miles' progress note indicates that Plaintiff's left knee was swollen. No bony abnormalities or deformities were noted and Plaintiff had full range of motion. Plaintiff was able to bear his own weight. He was given Advil, warm compresses, and scheduled for an x-ray on his left knee. X-rays were taken on July 22, 2011. According to the radiology report, the two views of the left knee revealed normal bony alignment. There was no acute regional bony fracture or discoloration. Minor early degenerative changes were seen. On July 23, 2011, Plaintiff was seen by a nurse practitioner regarding acid reflux disease. No mention was made in the nurse's notes of Plaintiff discussing his knee. On July 29, 2011, a nurse advised Plaintiff that x-ray results were negative and allowed him to return to work. Plaintiff was instructed to return as needed for medical attention. Plaintiff saw nurses twice in August 2011 for issues other than his knee. On September 1, 2011,

he saw Nurse Daily for nasal congestion, but Daily's report noted that Plaintiff's knee x-rays showed minor degenerative changes and that Plaintiff refused an Ace bandage and analgesic balm.

Plaintiff first saw Defendant for complaints regarding his left knee on September 2, 2011. Defendant reviewed the x-rays of Plaintiff's knee which showed, at best, early minor osteoarthritis. After a physical exam, Defendant noted, among other things, that Plaintiff's left quadriceps, hamstring, and calf showed no signs of atrophy, a mild limp, very minimal knee effusion, no tenderness in the peripatellar, no patellar tracking problems, and mild mid-popliteal tenderness. Plaintiff had a full range of motion. Plaintiff responded to the Valgus stress test on his left knee with complaints of medial pain. The test was performed only at full extension. After conducting a series of other tests, Defendant concluded that Plaintiff's knee pain was suggestive, at most, of an MCL ligament strain. Defendant identified no sign of a full or partial tear of the MCL. Defendant prescribed Naproxen, a left knee sleeve, and ordered that Plaintiff be scheduled for follow-up at the doctor's sick call in thirty days. Defendant noted that the Valgus stress test was to be repeated at both full extension and twenty-five degree flexion. Plaintiff was also provided education and counseling and advised to avoid stress to the knee such as physical contact sports.

Defendant saw Plaintiff for a follow up visit on October 3, 2011, for Plaintiff's complaints relating to his left knee. During this examination, Plaintiff was stable, in no apparent distress, able to ambulate satisfactorily (though with an antalgic gait), and had good activities of daily living. Defendant noted that Plaintiff stated the Naproxen had helped. Defendant noted no obvious deformities and concluded that Plaintiff had full range of motion in his knees. Plaintiff

tested positive on the Valgus stress test at full extension and at thirty degrees flexion of the left

knee.  After concluding a series of other tests and assessments, Defendant concluded that

Plaintiff had a left MCL injury.  He renewed Plaintiff's prescription for Naproxen and provided

Plaintiff with MCL exercises.  He also ordered that Plaintiff be scheduled for a follow up visit in

thirty days.  Plaintiff testified at his deposition that he was still in pain during the October visit

and requested Defendant order him to receive a magnetic resonance imaging (MRI) scan for his

left knee.

On November 3, 2011, Defendant saw Plaintiff for his follow up visit.  Defendant noted

that Plaintiff walked with a normal gait, had full flexion extension and active movement of the

left knee, which had no swelling.  He also noted that Plaintiff had no new complaints regarding

his left knee.  Defendant concluded that Plaintiff's left knee strain had improved.  Plaintiff was

provided education and counseling and continued to have the left knee sleeve.  Otherwise, as his

condition had improved, no new orders were entered by Defendant regarding Plaintiff's prior

complaints of left knee pain.  Plaintiff stated, during his deposition, that on this last visit his knee

was still somewhat swollen and he continued to request an MRI.

Defendant discussed the MCL in his declaration, which was attached as part of Exhibit 2

to Defendant's Motion for Summary Judgment (#42).  The MCL is located on the inner side of

the knee and provides stability to the knee joint.  The initial treatment for most MCL injuries

focuses on reducing the pain and inflammation in the knee while immobilizing the knee to keep

it stabilized.  The decision to recommend a specific test, such as an MRI, is determined by

whether or not the patient's symptoms and presentation suggest a medical need for such test to

determine whether a specific course of treatment might be beneficial for the patient.  An MRI is

not a treatment modaility.  Typically, an MRI is utilized only if surgical intervention is being considered.  It is one of a number of tests that can be ordered to obtain more information about a person's condition, and may provide guidance or assistance when determining one treatment plan versus another.

In Plaintiff's case, in Defendant's personal opinion, based on his education, training, and experience, an MRI was not required to confirm or reject the severity of Plaintiff's injury, or whether his knee sprain had improved.  Defendant claims an MRI would be an unnecessary test, based upon his clinical assessment of Plaintiff's condition, and Defendant would not have recommended surgical intervention or any course of treatment different from what he did provide.  Based upon Defendant's clinical assessment of Plaintiff and in his professional opinion, again based on his education, training, and experience, Plaintiff was not, and is not, a surgical candidate for his non-specific knee sprain.

Defendant stated, in his declaration, that all of the care and treatment he provided to Plaintiff was based on Defendant's medical judgment, education, experience, and training. Defendant declared that, while under Defendant's care at DCC, Plaintiff received all care that was medically necessary.

From November 3, 2011 (his last visit with Defendant) through December 12, 2012 (the date of his deposition), Plaintiff had not made any further requests to see Defendant regarding his left knee.  Plaintiff is familiar with the sick call request procedure at the DCC, and medical staff would have seen Plaintiff for further complaints regarding his left knee after November 3, 2011, had Plaintiff made a sick call request.  According to Plaintiff's medical records, on May 31, 2013, Plaintiff was seen by Nurse White for reported swelling on his knee.  According to the

note, Nurse White concluded that the swelling was minor and that there was no need for a referral to the doctor.  Thus, Defendant did not see or treat Plaintiff at that time.  Plaintiff was provided education and pain medication.

Procedural History

Plaintiff filed his Complaint (#1) on March 27, 2012.  Count I of Plaintiff's Complaint was captioned: "Defendant Paul Talbot Has Denied the Plaintiff Medical Treatment for a Injured Knee Wheres His Action Are With Deliberate Indifference."  Plaintiff alleges he injured his knee on July 7, 2011, and it was not until August 5, 2011 that he was able to see Defendant.  Plaintiff alleges that at that time "Defendant was not trying to hear anything Plaintiff was saying and this is a problem throughout [DCC]."  Plaintiff also alleges there is a problem with the x-ray machine at DCC and that Defendant knows about the problem, but still allows Plaintiff to walk around with pain and suffering.  Plaintiff alleges that Defendant told him to leave his office despite Plaintiff trying to make Defendant aware of the extent of his injury.  Plaintiff claims he has requested an MRI, which would reveal injuries to his knee, but that Defendant continues to deny his request.  Plaintiff claims he has filed grievances with the DCC on this issue.  Plaintiff concludes that: "[t]he improper screening and examination and denial of any treatment and diagnose which were inconsistent, and a great disregard to protect the plaintiff's health and safety while having the full knowledge of the injury and deliberately standing by and allowing the plaintiff to remain in pain and suffering."  Count II of the Complaint concerned Plaintiff's demand for a soy-free diet.

On April 26, 2012, a merit review hearing was held before District Judge Michael P. McCuskey. Judge McCuskey dismissed Count II (soy-free diet) of the Complaint with leave to

reinstate.  All other defendants except Defendant Talbot were dismissed from the case.  Plaintiff

was allowed to proceed on Count I (knee injury count).  On August 9, 2013, Defendant filed this

current Motion for Summary Judgment (#42).  Plaintiff filed his Response (#45) on September 4,

2013.  Defendant filed his Reply (#48) on October 7, 2013.  On November 14, 2013, Plaintiff

filed a Sur-Reply (#49) to Defendant's Reply (#48), leading Defendant to file a Motion to Strike

(#50) the Sur-Reply on December 2, 2013.  Plaintiff filed a Response (#51) to the Motion to

Strike on January 7, 2014.  The case is now fully briefed and ready for judgment.

MOTION TO STRIKE

The court will first address Defendant's Motion to Strike Plaintiff's Reply to Defendant

Talbot's Response to the Plaintiff's First Reply for Summary Judgment (#50).  In Plaintiff's Sur-

Reply (#49), he states it took until September 2, 2011 for Defendant to state that there was an

MCL injury and it took until February 22, 2013 for Plaintiff to receive a knee brace for the MCL

injury and that the delay of treatment for three years was proof of deliberate indifference.

Plaintiff attached to the Sur-Reply medical records from his visits with medical staff at DCC as

well as documents of the medical procedures and policies, marked "confidential," employed by

Wexford Health Sources Incorporated, the provider of medical services to the DCC.  Defendant

argues that the Sur-Reply should be stricken because the local rules of the Central District of

Illinois do not permit sur-replies and because the Wexford medical procedures documents

attached to the Sur-Reply are subject to a Protective Order (#39) entered by this court.  Under

the Protective Order (#39), documents marked "confidential" should be referred to only by

description and exhibit number without filing the document itself.  Plaintiff responds that he "did

not violate the protective order due to the court has a copy of the Wexford Inc. policies and

-7-

procedures and this is between the judge himself and the court nobody else has these policies and procedures."

Motions to strike are generally disfavored because they have the potential to delay proceedings, however where motions to strike remove unnecessary clutter from a case they serve to expedite, rather than delay.  *Heller Financial, Inc. v. Midwhey Powder Co., Inc.*, 883 F.2d 1286, 1294 (7th Cir. 1989).  Defendant correctly points out that sur-replies are not permitted under Local Rule 7.1(D) of the Local Rules of the Central District of Illinois.  However, a Note attached to Rule 7.1(D) states that the rule does not apply to pro se litigants, of whom Plaintiff is one.  Therefore, the court will not strike the Sur-Reply under the local rule.  The court does agree that Plaintiff's attachment of the "confidential" material does violate section IV of the Protective Order (#39).  The court will not consider material filed in the Sur-Reply in violation of the Protective Order.[2]  Because motions to strike are generally disfavored, and because Plaintiff is a pro se litigant not subject to Local Rule 7.1(D), Defendant's Motion to Strike Plaintiff's Reply to Defendant Talbot's Response to the Plaintiff's First Reply for Summary Judgment (#50) is DENIED.

## SUMMARY JUDGMENT

Defendant argues that he was not deliberately indifferent to Plaintiff's serious medical need and was entitled to qualified immunity.  Defendant argues Plaintiff repeatedly received

---

[2]However, even were the court to consider the Wexford policies, it agrees with Defendant's assertion that, by themselves, "violations of internal policies and procedures do not give rise to a constitutional violation."  See *Whitman v. Nesic*, 368 F.3d 931, 935 n.1 (7th Cir. 2004) (the mere fact that state rules or laws are violated does not in and of itself amount to a constitutional violation giving rise to a § 1983 claim).  Even were to consider the Wexford policies, Plaintiff's argument would fail due to the reasons discussed below.

attention and treatment for his left knee and the care was effective.  Further, Defendant's

decision not to order an MRI for Plaintiff was based on his own reasoned medical opinion.

Defendant concluded an MRI was not necessary based on his clinical assessment of Plaintiff's

condition and he would not have recommended surgical intervention or any course of treatment

different from what he provided Plaintiff.  Defendant argues that this does not rise to the level of

cruel and unusual punishment.  Plaintiff responds that there is a genuine issue of material fact.

Plaintiff states that he saw Defendant on September 2, 2011 and was told merely to "drink more

water" for a severe, swollen, and painful two-month old knee injury.  Plaintiff argues that

Defendants "makes the statement that there wasn't a MCL injury and then turns around and

states that there is a MCL injury how can the defendant make the decision of not providing a

MRI wheres his own judgment has been wrong!"  Plaintiff argues that prison officials "must

respond to *all* of your serious medical needs, and the fact that you are properly treated on some

occasions does not excuse deliberate indifference on others."  Plaintiff states "the fact that

plaintiff Perez had to go to the warden in order to get the defendant to see him clearly states a

deliberate indifferent claim wheres there remains the serious needs of a MRI to reveal that there

is a real injury to this knee."

*Summary Judgment Standard*

Summary judgment is appropriate "if the movant shows that there is no genuine dispute

as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P.

56(a); see also *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986).  In ruling on a motion for

summary judgment, a district court "has one task and one task only: to decide, based on the

evidence of record, whether there is any material dispute of fact that requires a trial."  *Waldridge*

*v. Am. Hoechst Corp.*, 24 F.3d 918, 920 (7th Cir. 1994).  In making this determination, the court

must construe the evidence in the light most favorable to the nonmoving party and draw all

reasonable inferences in favor of that party.  See *Anderson v. Liberty Lobby, Inc.*,  477 U.S. 242,

255 (1986); *Singer v. Raemisch*, 593 F.3d 529, 533 (7th Cir. 2010).  However, a court's favor

toward the nonmoving party does not extend to drawing inferences which are only supported by

speculation or conjecture.  See *Singer*, 593 F.3d at 533.  In addition, this court "need not accept

as true a plaintiff's *characterization* of the facts or a plaintiff's legal conclusion." *Nuzzi v. St.

George Cmty. Consol. Sch. Dist. No. 258*, 688 F. Supp. 2d 815, 835 (C.D. 2010) (emphasis in

original).

       The party opposing summary judgment may not rely on the allegations contained in the

pleadings.  *Waldridge*, 24 F.3d at 920.  "[I]nstead, the nonmovant must present definite,

competent evidence in rebuttal."  *Butts v. Aurora Health Care, Inc.*, 387 F.3d 921, 924 (7th Cir.

2004).  Summary judgment "is the 'put up or shut up' moment in a lawsuit, when a party must

show what evidence it has that would convince a trier of fact to accept its version of events."

*Koszola v. Bd. of Educ. of City of Chicago*, 385 F.3d 1104, 1111 (7th Cir. 2004), quoting *Johnson

v. Cambridge Indus., Inc.*, 325 F.3d 892, 901 (7th Cir. 2003).  Specifically, to survive summary

judgment, the nonmoving party "must make a sufficient showing of evidence for each essential

element of its case on which it bears the burden at trial."  *Kampmier v. Emeritus Corp.*, 472 F.3d

930, 936 (7th Cir. 2007), citing *Celotex Corp.*, 477 U.S. at 322-23.

       *Analysis*

       Plaintiff argues that Defendant has been deliberately indifferent to his serious medical

need, in violation of the prohibition against cruel and unusual punishment contained in the

Eighth Amendment to the Constitution of the United States.  In 1976, the United States Supreme

Court held that "deliberate indifference to serious medical needs of prisoners constitutes the

'unnecessary and wanton infliction of pain,'" proscribed by the Eighth Amendment.  *Estelle v.*

*Gamble*, 429 U.S. 97, 104 (1976), quoting *Gregg v. Georgia*, 428 U.S. 153, 173 (1976).  The

Court stated that this was true "whether the indifference is manifested by prison doctors in their

response to the prisoner's needs or by prison guards in intentionally denying or delaying access

to medical care."  *Estelle*, 429 U.S. at 104-05.  The Court further stated that "[t]his conclusion

does not mean, however, that every claim by a prisoner that he has not received adequate

medical treatment states a violation of the Eighth Amendment."  See *Estelle*, 429 U.S. at 105.

"To succeed on a deliberate indifference claim, a plaintiff must (1) demonstrate that his medical

condition is 'objectively, sufficiently serious,' and (2) demonstrate that the defendant acted with

a 'sufficiently culpable state of mind.'" *Holloway v Delaware County Sheriff*, 700 F.3d 1063,

1072 (7th Cir. 2012), quoting *Farmer v. Brennan*, 511 U.S. 825, 834 (1994).

  "To demonstrate that a defendant acted with a 'sufficiently culpable state of mind,' a

plaintiff must put forth evidence that the defendant knew of a serious risk to the plaintiff's health

and consciously disregarded that risk."  *Holloway*, 700 F.3d at 1073, quoting *Johnson v.*

*Doughty*, 433 F.3d 1001, 1010 (7th Cir. 2006).  "This subjective standard requires more than

negligence and it approaches intentional wrongdoing."  *Holloway*, 700 F.3d at 1073, citing

*Collignon v. Milwaukee Cnty.*, 163 F.3d 982, 988 (7th Cir. 1998).  Indeed, the Seventh Circuit has

consistently held that deliberate indifference "requires a showing of more than mere or gross

negligence."  *Rosario v. Brawn*, 670 F.3d 816, 821 (7th Cir. 2012), quoting *Collins v. Seeman*,

462 F.3d 757, 762 (7th Cir. 2006).  The Supreme Court has compared the deliberate indifference

standard to that of criminal recklessness. *Holloway*, 700 F.3d at 1073, citing *Farmer*, 511 U.S. at 837. The Seventh Circuit has "characterized the standard as imposing a high hurdle on plaintiffs because it requires a 'showing as something approaching a total unconcern for the prisoner's welfare in the face of serious risks." *Rosario*, 670 F.3d 816, 821 (7th Cir. 2012), quoting *Collins v. Seeman*, 462 F.3d 757, 762 (7th Cir. 2006). Even if officials are aware of a substantial risk of serious harm, they are not liable if they "responded reasonably to the risk, even if the harm ultimately was not averted." *Jackson v. Ill. Medi-Car, Inc.*, 300 F.3d 760, 765 (7th Cir. 2002), quoting *Farmer*, 511 U.S. at 843; see also *Rosario*, 670 F.3d at 822.

Therefore, the Seventh Circuit has recognized that the Constitution is not a medical code that mandates specific medical treatment. See *Jackson v. Kotter*, 541 F.3d 688, 697-98 (7th Cir. 2008), citing *Snipes v. DeTella*, 95 F.3d 586, 592 (7th Cir. 1996). A prisoner is not entitled to receive "unqualified access to healthcare." *Holloway*, 700 F.3d at 1073, quoting *Hudson v. McMillian*, 503 U.S. 1, 9 (1992). "Instead, prisoners are entitled only to 'adequate medical care.'" *Holloway*, 700 F.3d at 1073, quoting *Johnson*, 433 F.3d at 1013. "There is not one 'proper' way to practice medicine in prison, but rather a range of acceptable courses based on prevailing standards in the field." *Jackson*, 541 F.3d at 697, citing *Snipes*, 95 F.3d at 592. "For a medical professional to be held liable under the deliberate indifference standard, he must make a decision that is 'such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that the person responsible actually did not base the decision on such a judgment.'" *Holloway*, 700 F.3d at 1073, quoting *Jackson*, 541 F.3d at 697.

In this case, Plaintiff injured his knee playing basketball on July 14, 2011, and did not see Defendant until September 2, 2011. In the meantime, Plaintiff saw a nurse or nurse practitioner

-12-

on at least seven separate occasions, and on three of these occasions never mentioned a complaint involving his left knee. When he did visit the medical staff to complain about his knee, he was examined and provided aid and advice. The day after Plaintiff's injury, Defendant reviewed the nurse's notes and concluded that Plaintiff should return as needed. On July 20, 2011, when he saw Nurse Miles, the nurse noted that the left knee was swollen, but that Plaintiff still had full range of motion and was able to bear his own weight. Still, the nurse provided Plaintiff Advil and a warm compress and scheduled Plaintiff for a left knee x-ray. On September 1, 2011, Plaintiff saw a nurse for nasal congestion, but the nurse noted that Plaintiff refused an Ace bandage and analgesic balm for the knee.

Plaintiff's first actual interaction with Defendant regarding his knee occurred during the September 2, 2011 visit. During this visit Defendant reviewed Plaintiff's x-rays, conducted a physical exam and Valgus stress test, and other tests. Plaintiff did complain of medial pain, but Defendant noted Plaintiff had full range of motion. Defendant identified no sign of a full or partial MCL tear, and concluded that Plaintiff's knee pain was suggestive, at most, of an MCL ligament strain. Defendant prescribed Naproxen, a left knee sleeve, and ordered Plaintiff to visit for a follow up in thirty days time. He also provided Plaintiff with counseling and advised him to avoid stress to the knee. Defendant saw Plaintiff for his follow up on October 3, 2011, where he noted that Plaintiff appeared stable, was in no apparent distress, and had good activities of daily living. Plaintiff told Defendant the Naproxen had helped. Defendant noted no obvious deformities and concluded that Plaintiff had full range of motion in his knees. However, after conducting a series of tests and assessments, Defendant concluded Plaintiff had a left MCL injury and renewed Plaintiff's prescription for Naproxen. Defendant also provided Plaintiff with

-13-

MCL exercises and scheduled him for another follow up in thirty days.  On the third visit, which took place November 3, 2011, Defendant noted that Plaintiff walked normally, had active movement, and no swelling or new complaints about the left knee.  Defendant concluded that the knee sprain had improved and so he provided Plaintiff education and continued to have the left knee in a sleeve.  From November 3, 2011 until December 12, 2012, Plaintiff made no further requests to see Defendant regarding his left knee, despite being familiar with the sick call request procedure at DCC.  He did see Nurse White on May 31, 2013, for left knee swelling, but the nurse concluded the swelling was minor and there was no need for a referral to the doctor.

      The above recited facts, based on the record in this case, reveal that Defendant was not deliberately indifferent to Plaintiff's serious medical needs.[3]  While the medical treatment received by Plaintiff may not have been perfect or matched the level of treatment received at the Mayo Clinic, Plaintiff is not entitled to "unqualified access to healthcare," but rather only medical care that is adequate.  See *Holloway*, 700 F.3d at 1073.  The record shows that medical staff at DCC responded to Plaintiff's complaints and evaluated his knee injury, providing Plaintiff medication, education, and advice.  Defendant himself reviewed the nurse's note about Plaintiff's knee the day after his injury and advised that Plaintiff should return as needed.  Defendant saw Plaintiff three times at monthly intervals in late 2011, ordering Plaintiff to return for follow up visits on two occasions.  During these visits Defendant reviewed x-rays and conducted numerous tests on Plaintiff to evaluate the extent of Plaintiff's left knee injury.  Based

---

[3]Defendants have also argued that they are entitled to qualified immunity.  Because of this court's conclusion that there is no dispute of material fact regarding whether Defendants were deliberately indifferent to Plaintiff's serious medical needs, this court does not need to reach this issue.

on his years of medical training and experience, it was Defendant's professional medical opinion had an MCL injury, such as a strain and that by the last visit, the injury had improved.  To this end Defendant prescribed Plaintiff Naproxen, a left knee sleeve, and education and advice on how to help the injury heal.  The evidence of record shows that Defendant was attentive to Plaintiff's complaints and needs and diligent in diagnosing Plaintiff's problem.  Defendant, based on his training and experience, formed conclusions about Plaintiff's injury and took what he considered to be the most reasonable actions to treat said injury.

Setting aside whether Plaintiff has sufficiently demonstrated the objectively seriously nature of his injury, Plaintiff has not shown that Defendant acted with a "sufficiently culpable state of mind."  See *Farmer*, 511 U.S. at 834.   There is no evidence that Defendant was "aware of a substantial risk of serious harm," but, even if he were, Defendant responded reasonably to the risk.  See *Jackson*, 300 F.3d at 765.  The facts simply do not demonstrate that Defendant was in any way grossly negligent, or even merely negligent, in his treatment of Plaintiff, let alone that Defendant was guilty of the criminal recklessness necessary to meet the deliberately indifferent standard.  *Rosario*, 670 F.3d at 821; *Holloway*, 700 F.3d at 1073.  The evidence does not show that Defendant's decisions were such a substantial departure from accepted professional judgment, practice, or standards, as to demonstrate that Defendant actually did not base his decisions on such a professional judgment.  See *Holloway*, 700 F.3d at 1073.  Plaintiff has not met his "high hurdle" of showing that Defendant evinced a total unconcern for his welfare in the face of serious risks.  See *Rosario*, 670 F.3d at 821.  To the contrary, the record reveals that Defendant conscientiously treated Plaintiff and met Plaintiff's medical needs.  Thus, there is no genuine issue of material fact as to whether Defendant was indifferent to Plaintiff's

serious medical needs.

Plaintiff makes a number of arguments that he believes demonstrate a genuine issue of material fact concerning Defendant's deliberate indifference. First, Plaintiff argues that Defendant intentionally delayed seeing him and ignored his injury for two months. That assertion, however, is contradicted by Defendant's declaration that he reviewed Nurse White's notes on Plaintiff's initial visits and concluded that Plaintiff should continue to be seen as needed. Any claim by Plaintiff that he was deliberately ignored or that Defendant intentionally delayed seeing him, as some sort of act of deliberate indifference, is an inference based on mere speculation or conjecture on Plaintiff's part, and such inferences cannot defeat summary judgment. See *McDonald v. Village of Winnetka*, 371 F.3d 992, 1001 (7th Cir. 2004).

Next, Plaintiff claims that a genuine of material fact exists because, in his declaration, "defendant made the statement of there wasn't a MCL injury and turn's around an estate's that there was an MCL injury." However, Plaintiff's interpretation of the declaration is in error. In paragraph 24 of the declaration, describing the September 2, 2011 visit, Defendant states "[a]fter conducting a series of other tests I concluded that Mr. Perez's knee pain was suggestive, at most, of a medial collateral ligament ("MCL") strain. I identified no sign of a full or partial tear of the MCL." In paragraph 29 of the declaration, describing the follow up October 3, 2011 visit, Defendant declares "[a]fter concluding a series of other tests and assessments, I concluded that Mr. Perez had a left MCL injury. I renewed plaintiff's prescription for Naproxen and Mr. Perez was given exercises for his MCL." These statements are not contradictory and do not create a genuine issue of material fact. The term "injury" is broad, and it is perfectly reasonable to interpret the suggested MCL strain of September 2, 2011 as the "injury" of October 3, 2011.

-16-

However, even if the court indulged in Plaintiff's interpretation, Defendant's change of diagnosis and how he preferred to treat that diagnosis would be a matter of medical judgment. Even if that diagnosis or treatment were initially improper, absent intentional wrongdoing or criminal recklessness on Defendant's part in treating Plaintiff, it does not rise to the level of deliberate indifference. See *Gutierrez v. Peters*, 111 F.3d 1364, 1374 (7th Cir. 1994) ("medical malpractice in the form of an incorrect diagnosis or improper treatment does not state an Eighth Amendment claim.").

Plaintiff also mentions the fact that, in 2013, he received a knee brace, to show that his condition has gotten worse due to "delay" in treatment. Plaintiff did not receive this brace until well after the initiation of the lawsuit, but, even if Plaintiff could make a connection between treatment received from Defendant in 2011, and need for the brace in 2013, the court finds Defendant responded reasonably to the risk of harm at the time, even if the harm ultimately was not averted. See *Jackson*, 300 F.3d at 765, quoting *Farmer*, 511 U.S. at 843; see also *Rosario*, 670 F.3d at 822.

In his deposition, Plaintiff testified that his claim against Defendant is that Defendant did not give him the course of medical treatment Plaintiff requested to resolve his medical problem, namely the MRI. As stated above, however, the United States Constitution is not a "medical code" that mandates specific medical treatment. *Jackson,* 541 F.3d at 697-98. Defendant made a diagnosis and treatment decision based on his training and experience as a doctor. Defendant stated in his declaration that an MRI is not a treatment modality, but rather is utilized only if surgical intervention is being considered. In Plaintiff's case, Defendant determined, based on his medical judgment, that an MRI was not required to confirm or reject the severity of Plaintiff's

-17-

injury, or whether his knee strain had improved.  Because Defendant would not have recommended surgical intervention or any course different from what he did provide Plaintiff, an MRI would have been unnecessary.  Plaintiff's request for an MRI is Plaintiff's *preferred* course of medical treatment.  Plaintiff, however, is not a medical professional, and he is not entitled to unqualified access to healthcare.  See *Holloway*, 700 F.3d at 1073.  Rather, Plaintiff is entitled to *adequate* healthcare under the Constitution, which is what was provided by Defendant.  See *Holloway*, 700 F.3d at 1073.  Defendant's decision not to order an MRI for Plaintiff was, under the circumstances, a reasonable decision based on Defendant's sound medical judgment.  Though Plaintiff may have disagreed with Defendant's decision, Defendant did not ignore Plaintiff and Defendant's treatment decisions certainly did not constitute intentional wrongdoing or criminal recklessness so as to rise to the level required to demonstrate deliberate indifference under the Eighth Amendment.  See *Holloway*, 700 F.3d at 1073; *Rosario*, 670 F.3d at 821.

This court concludes that the record shows that Defendant attentively treated Plaintiff for Plaintiff's knee injury at DCC.  Although Plaintiff has many complaints about Defendant's medical decisions, he is entitled to adequate medical care, not the specific medical treatment he desires.  This court concludes that the Defendant has met his burden to show that there is no genuine dispute of material fact regarding whether Defendant was deliberately indifferent to Plaintiff's serious medical needs.  Defendant's Motion for Summary Judgment (#42) is GRANTED.

IT IS THEREFORE ORDERED THAT:

(1) Defendant's Motion to Strike Plaintiff's Reply to Defendant Talbot's Response to the Plaintiff's First Reply for Summary Judgment (#50) is DENIED.

-18-

(2) Defendant's Motion for Summary Judgment (#42) is GRANTED.  Judgment is entered in favor of Defendant and against Plaintiff.

(3) This case is terminated.


ENTERED this 23rd day of January, 2014.

s/ COLIN S. BRUCE
U.S. DISTRICT JUDGE